# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAFAYETTE DIVISION

| | | |
|---|---|---|
| KATIE LOUISE BOUDREAUX | * | CIVIL ACTION NO. 15-0443 |
| VERSUS | * | JUDGE DOHERTY |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE WHITEHURST |

## REASONS FOR JUDGMENT

The undersigned was referred this social security appeal by consent of the parties.  For the reasons set forth below, the Commissioner's decision is hereby **REMANDED** for further administrative action pursuant to the fourth sentence of 42 U.S.C. § 405(g).

## I. Background

Katie Louis Boudreaux ("Boudreaux"), born in1969, filed applications for a period of disability, disability insurance benefits and supplemental security income ("SSI") on September 17, 2012, alleging disability as of August 22, 2012, due to major depressive order, adjustment disorder, left fronto-temporal encephalomalacia, status-post left frontal craniotomy, left hemi-cranial headaches and a history of seizure disorder.

At the administrative hearing held on September 24, 2013, Boudreaux testified that she had a 10th grade education and was able to read and write.  (Tr. 37).   She lived alone, had no income, and relied on friends for financial support.

Boudreaux reported that she was laid off from her last job as an assistant manager at Family Dollar due to her concentration problems, poor eyesight, face numbness and blackouts. (Tr. 37, 44, 49).  She had a brain tumor removed as a teenager, resulting in ongoing headaches,

visual problems and new onset of depression.  (Tr. 38, 40).  Her headaches were severe, and not always relieved by pain medication.  (Tr. 41).  She said that her medications, including Cymbalta, Lortab, Butalbital, Neurontin, Tegretol and Citalopram, caused sleepiness.  (Tr. 40, 50).

Boudreaux stated that she could not work because she could not focus or concentrate.  (Tr. 38).  She could not walk much or stand too long.  She also complained of blurred vision, numbness, depression, anxiety and memory problems.  (Tr. 38, 40, 43, 50).  She stated that a counselor came to her house once a week.  (Tr. 41).

Regarding activities, Boudreaux testified that she watched little TV.  (Tr. 42).  She had friends come over weekly to help her with chores and grocery shopping.  Her Function Report indicated that she prepared simple meals, performed household chores, shopped, handled a checkbook and counted money, played on the computer, painted, worked on puzzles and did embroidery.  (Tr. 215-18).

Boudreaux's stepmother, Chalendra Gitry Como ("Como"), testified that Boudreaux experienced severe head pain, confusion, and declining eyesight.  (Tr. 57, 69).  She reported that Boudreaux needed assistance with household chores, paperwork and going places.  Ms. Como stated that she saw Boudreaux every other day, and that she usually was doing very little.  (Tr. 58).

Ms. Como further testified that a counselor from Loving Hearts visited Boudreaux weekly for her depression and suicidal thoughts.  (Tr. 59).  She reported that she was helping claimant financially.  (Tr. 61).

As to her medical records, Boudreaux had a benign brain tumor removed at age 13.  An

automobile accident in August, 2012, exacerbated her condition, including headaches and dizziness, as well as seizures.

Records from Fleur de Lis Community Health Clinic show that Boudreaux was seen on August 23, 2012, for complaints of blacking out and having a motor vehicle accident the day before, and possible seizures with occasional dizziness, shakiness and weakness. (Tr. 263). She also complained of severe anxiety. She was referred for an EEG and prescribed Celexa. (Tr. 264).

An EEG dated August 28, 2012, was abnormal due to the presence of intermittent sharp waves, which could be consistent but not conclusive with epileptiform discharges. (Tr. 258). A CT scan dated August 22, 2012, revealed presumed post-surgical encephalomalacia of the left hemisphere, with no acute intracranial abnormalities. (Tr. 276). An MRI of the brain revealed a large encephalomalacic defect in the posterior left temporal lobe, suggesting a previous infarction, with chronic encephalomalacia, and several areas of small dilated cystic fluid spaces, consistent with focal collection of dilated perivascular spaces, not a neoplasm. (Tr. 255).

In October, 2012, Boudreaux presented at UMC for left-sided ear, face and neck pain after recent syncope. (Tr. 290-93). On examination, she had tenderness around the left mastoid. (Tr. 293). X-rays revealed opacification of a few posterior left mastoid air cells with no middle ear effusion. (Tr. 294). Her diagnosis was left otitis. (Tr. 293).

A CT of the brain dated October 11, 2012, revealed post-surgical changes of prior left temporary craniotomy, with underlying encephalomalacia consistent with prior studies in August, 2012. (Tr. 298, 299). The impression was facial pain. (Tr. 302).

Audiometric evaluation in November, 2012, revealed mild sensorineural hearing loss of

the left ear.  (Tr. 285-86).

On November 26, 2012, David Greenway, Ph.D., performed a consultative mental examination (Tr. 327).  Boudreaux complained of having occasional seizures and chronic headaches following a car accident.  She reported that her seizures were well-controlled on medication, and her other symptoms were moderately well-controlled on psychotropic medications.  (Tr. 328).

On examination, Boudreaux complained of a depressed mood beginning after her automobile accident in August, 2012.  (Tr. 328).  She tended to hold the left side of her head throughout the interview and reported that she was feeling crippling headache pain.  She reported minimal household chores, no social activities, and playing games on the computer or watching TV in her free time. (Tr. 329).

Boudreaux's verbal behavior was of normal rate and volume.  She had no evidence of a formal thought disorder.  (Tr. 328). Boudreaux's receptive skills were good.  Her affective expression, insight and judgment, and social skills were adequate.  (Tr. 328-29).  She was alert and oriented, and had intact recent and remote memories, even pace and adequate persistence. (Tr. 329).  Her estimated overall intelligence was in the low average range of intellectual functioning.

Dr. Greenway's diagnosis was adjustment disorder with mild depression.  (Tr. 329). He determined that Boudreaux's Global Assessment of Functioning ("GAF") score was 65 (mild to moderate).  He found that she was able to maintain competitive employment similar to her past work experience; understand, remember and carry out relatively detailed instructions; maintain attention to perform simple, repetitive tasks for two-hour blocks of time; tolerate normal work-

related stress, and sustain effort and persist at a normal pace over the course of a routine 40-hour workweek. He opined that her social skills were adequate, and she was able to relate to others in employment settings.

On December 5, 2012, Joseph Kahler, Ph.D., completed a psychiatric review technique form for Disability Determination Services. (Tr. 72-73). Dr. Kahler opined that Boudreaux had mild restrictions of activities of daily living, mild difficulties maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace. (Tr. 73). She had no episodes of decompensation of extended duration.

An EEG dated December 6, 2012, was abnormal. (Tr. 379). The diagnoses were brain neoplasm of unspecified nature and unspecified epilepsy without mention of intractable epilepsy. (Tr. 379-80).

On January 20, 2013, Boudreaux saw Dr. William Brennan for complaints of headaches, decreased left eye vision and left-sided facial numbness. (Tr. 339, 343). A CT scan revealed left parietotemporal encephalomalacia and left superior parietal hypodensity with questionable vasogenic edema. (Tr. 339). An MRI revealed left parietal periventricular white matter intra-axial clustered cysts with vasogenic edema. (Tr. 341). The reported noted that the MRI's finding was of uncertain etiology, but suggested active disease.

Dr. Brennan's impression was left hemicranial headaches of uncertain etiology which appeared to be temporally related to a motor vehicle accident in August, 2012. (Tr. 344). He did not believe there was any new malignancy. At a followup exam, he noted that neurological examination revealed a field defect in the right visual field, and a slightly unsteady gait. (Tr. 345).

On February 19, 2013, Boudreaux presented at the ophthalmology clinic with complaints of pain and light sensitivity.  (Tr. 347).  The impression was right superior quadrantanopia[1] visual field defect, refractive error, and headache.

On February 28, 2013, Boudreaux had a followup appointment at UMC for left-sided neck and headache pain.  (Tr. 364).  She had had no seizures for two weeks.  (Tr. 366).  Her depression was stable.

On March 15, 2013, Boudreaux reported having seizures and left-sided eye pain and decreased vision.  (Tr. 361).  Her vision was 20/60 on the left and 20/80 on the right.  (Tr. 362).  The impression was headache.  (Tr. 363).  It was noted that claimant had seen three neurosurgeons who had said that there was nothing on which to operate.  Pain management was recommended.

On April 8, 2013, Boudreaux complained of persistent headaches.  (Tr. 397).  A CT of the neck was negative.  (Tr. 383).  X-rays showed no evidence of acute injury.  (Tr. 401).  The impression was chronic headaches and neck pain.  (Tr. 399).

On June 11, 2013, Boudreaux complained of worsening vision, mouth bumps, orbital pain and seizures.  (Tr. 403).  The impression was mandibular tori,[2] and TMJ

On June 19, 2013, Boudreaux presented at UMC on a coroner's certificate with suicidal ideations and a plan to overdose with pills due to chronic untreated headaches.  (Tr. 372, 485).

---

[1]Quadrantanopia means defective vision or blindness in one fourth of the visual field. http://medical-dictionary.thefreedictionary.com/quadrantanopia (last viewed 7/27/16).

[2]Torus mandibularis (pl. tori mandibulares) (or mandibular torus (pl. mandibular tori) in English) is a bony growth in the mandible along the surface nearest to the tongue.  https://en.wikipedia.org/wiki/Torus_mandibularis (last viewed 7/27/16).

6

The impression was suicidal ideations, depression and anxiety.  (Tr. 374, 485-87).

Boudreaux complained of severe head pain, blurred vision, left-sided facial numbness and poor balance in June, 2013.  A CT of the brain dated June 20, 2013, showed no acute intracranial abnormalities and stable postoperative findings.  (Tr. 391).  An MRI taken on June 28, 2013, revealed a stable appearance of the brain.  (Tr. 389).

On August 27, 2013, Boudreaux presented at LaHaye Total Eye Care for complaints of blacking out and left-sided head pain.  (Tr. 501).  The impression on September 24, 2013, was headaches and cataracts.  (Tr. 502).

On September 4, 2013, Boudreaux was admitted to Acadia Vermilion Hospital on a physician's emergency certificate for depression and suicidal ideations.  (Tr. 508).  She complained of having a lot of anxiety and depression.  Her discharge diagnoses were major depression, single episode, severe, and increased stress.  (Tr. 510).  Her GAF score was 30 on admission, and 69 on discharge.

Boudreaux's discharge medications included Tegretol, Neurontin, Fish oil capsules, Cymbalta and Norco.  She was instructed to followup with Loving Hearts.  (Tr. 509).

Records from Loving Hearts Social Services indicate that Boudreaux received mental health treatment from August 12, 2013 through December 19, 2013.  (Tr. 523-57).  She had mood swings ranging from good to very depressed.  (Tr. 537).  She cried all of the time.  Her pain was getting worse, making her more depressed and suicidal with a plan of taking pills.  Her diagnosis was bipolar disorder without psychosis.  (Tr. 545).  Boudreaux's GAF score was 30 currently, and 30 for the previous year.  (Tr. 534).

On October 21, 2013, Boudreaux saw Dr. Daniel Dunlap for complaints of worsening

vision, left-sided headache and face numbness, balance problems, blackouts, dizzy spells, memory problems, and seizures.  (Tr. 580).  On examination, her vital signs were normal.  (Tr. 581).

On October 25, 2013, Boudreaux saw Dr. Sylvia Rojas for a second opinion.  (Tr. 575). She complained of seizures, left-sided face pain and forgetfulness.  (Tr. 576).  On examination, Boudreaux appeared to be in mild distress and demonstrated some facial grimacing.  (Tr. 577). Her mental status was notable for some difficulty in answering questions, and mild dysarthric speech impediment.  (Tr. 577-78).  She also had diminished sensation to her face.

Dr. Rojas' impression was history of left hemicranial headaches almost reminiscent of trigeminal neuralgia and a recurrence of seizures.  (Tr. 578).  She recommended MRI and MRA of the brain, Topomax for migraines and seizures, increased gabapentin level, a left occipital nerve block on the next visit, and possibly adding Cymbalta.

On November 19, 2013, Boudreaux complained of blurry vision.  (Tr. 563).  Dr. Rojas stated that her EEG showed some sharp waves coming from her left hemisphere near the area of her post-surgical site.  (Tr. 563, 565).  The MRA of her head showed a small left PCA, but the MRI of the brain was fairly stable with resection from the posterior left temporal lobe and surrounding gliosis extending into the left parietal lobe and some cystic changes.  (Tr. 563, 568, 572-73).  She prescribed oxcarbazepine for seizures and headache pain, Topamax for headache prophylaxis, and Vistaril and Naproxen for headache control.

On December 30, 2013, Boudreaux complained that her eyes were getting worse.  (Tr. 559).  She was wearing tinted glasses because her eyes were sensitive to light.  She reported headaches five times a day or several times a week.  Vistaril and Naproxen had made them better

8

than before.  Dr. Rojas continued gabapentin and referred her to a retina specialist.

40, 50).

## II. Law and Opinion

Boudreaux argues that: (1) the Commissioner's application of the special technique for evaluation of mental impairments fails to meet controlling legal standards and is not based on all relevant evidence of record; (2) the Commissioner's evaluation of her residual functional capacity ("RFC") fails to comport with controlling law, including SSR 96-8p, and is contradicted by the weight of the evidence, including medical opinion evidence of record, and (3) the Commissioner's evaluation of her credibility fails to comply with controlling law, including SSR 96-7p, and misstates relevant evidence.  Moreover, the Commissioner failed to evaluate the credibility of lay witness testimony by Ms. Como.  Because I find that the Commissioner failed to consider updated records regarding her mental impairment, I **ORDER** that this case be **REMANDED** for further evaluation.

As to the first argument, Boudreaux asserts that the ALJ improperly applied the special technique for evaluating her mental impairments.  [rec. doc. 11, p. 7; rec. doc. 13, p. 1]. The special technique for evaluation of mental impairments is found at 20 C.F.R. § 404.1520a, which provides, in pertinent part, as follows:

(a) [W]hen we evaluate the severity of mental impairments . . . we must follow a special technique at each level in the administrative review process. . . .

(b) Use of the technique.

(1) Under the special technique, we must first evaluate your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s). . . .

> (2) We must then rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of this section. . . .

(c) Rating the degree of functional limitation.

> (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and *all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation*. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment. . . .

(emphasis added).  20 C.F.R. § 404.1520a.

Boudreaux argues that the ALJ failed to consider evidence to obtain a "longitudinal picture" of her overall degree of functional limitation.  Specifically, she asserts the ALJ omitted consideration of key evidence of her updated medical records which were submitted after the hearing.

In evaluating Boudreaux's mental impairments, the ALJ cited the opinions of non-treating physicians Drs. Greenway and Kahler, and one treatment note from UMC indicating that her depression was "stable with current treatment."  (Tr. 14, 366).  Boudreaux asserts that the ALJ erroneously failed to consider her two-day admission to UMC in June 2013 for psychiatric evaluation due to suicidal ideations (Tr. 372-77, 422-38); the initial assessment by LPC Darcy of Loving Hearts in August 2013 diagnosing her with bipolar disorder and assigning her a GAF score of 30 (Tr. 531-48), and her inpatient admission to Acadia Vermilion Hospital under a physician's emergency certificate in September 2013 for major depression.  (Tr. 508-10).

10

At the hearing held on September 24, 2013, Boudreaux's former representative indicated that she would be updating the record with medical evidence from UMC, Acadia Vermilion, and other sources.  (Tr. 35).  After the ALJ issued her decision on January 22, 2014 (Tr. 11-20), the Appeals Council granted Boudreaux's current counsel an extension of time in which to submit additional evidence.  (Tr. 25-26).  The Appeals Council specifically stated that "Any more evidence must be new *and* material to the issues considered in the hearing decision dated January 22, 2014." (emphasis in original) (Tr. 25).

By letter dated May 14, 2014, Boudreaux's counsel submitted "new and material" medical evidence consisting of treatment records from Acadia Vermilion Hospital dated September 4, 2013 to September 9, 2013; UMC dated June 19, 2013 to July 31, 2013; Loving Hearts Social Services dated August 12, 2013 to December 19, 2013, and Dr. Brennan dated January 20, 2013 to May 15, 2013.  (Tr. 249-50).  Counsel indicated that this evidence "was not available to the ALJ at the time of her original decision due to omissions by her prior representative."  (Tr. 250).  These records, as well as reports from Our Lady of Lourdes (Drs. Dunlap and Rojas) dated September 13, 2013 to December 30, 2013, were available to the Appeals Council and made part of the record.  (Tr. 4-6).

The Court finds that the Commissioner erred in failing to consider these supplemental reports, which are clearly material to claimant's condition.  A review of the decision reflect that the only record from UMC which the ALJ considered, dated February 28, 2013, indicated that Boudreaux's depression was "stable with current treatment."  (Tr. 14, 366).  However, subsequent reports from UMC, Acadia Vermilion Hospital and Loving Hearts indicate that Boudreaux's deteriorated prior to the time that ALJ issued her opinion.

On June 19, 2013, Boudreaux presented at UMC with suicidal ideations and a plan to overdose with pills due to chronic untreated headaches. (Tr. 372). Three months later, she was admitted to Acadia Vermilion Hospital on a physician's emergency certificate for depression and suicidal ideations. (Tr. 508). Her GAF score was 30 on admission, and 69 on discharge.[3] (Tr. 510).

Records from Loving Hearts Social Services dated August 12, 2013 through December 19, 2013, indicate that Boudreaux had mood swings ranging from good to very depressed. (Tr. 537). She cried all of the time. Her pain was getting worse, making her more depressed and suicidal with a plan of taking pills. The initial psychological evaluation showed a diagnosis of bipolar disorder without psychosis. (Tr. 545). Claimant's GAF score was 30 currently, and 30 for the previous year. (Tr. 534).

Contrary to the ALJ's opinion, the medical evidence shows that Boudreaux's mental condition was *not* stable as of February, 2013. (emphasis added). The record reflects that claimant made two suicide attempts and experienced worsening depression after that date. Thus, the undersigned finds that this case should be remanded for further evaluation in light of these updated medical records.

---

[3] The GAF scale is no longer included in the DSM-V. *Spencer v. Colvin*, 2016 WL 1259570, at *6 n. 8 (W.D. Tex. Mar. 28, 2016); *Locure v. Colvin*, 2015 WL 1505903, at *10 (E.D. La. April 1, 2015) ("both the American Psychiatric Association and the Commissioner have recently decided that GAF scores are not helpful in either medical or disability decision-making."); *White v. Colvin*, 2013 WL 4413335, at *1 (S.D. Tex. Aug. 12, 2013). However, the SSA published internal instructions regarding how to continue interpreting GAF scores that appear in medical records, noting that such scores should be treated as opinion evidence. *Jackson v. Colvin*, 2015 WL 7681262 at *3 (N. D. Texas Nov. 5, 2015). The SSA further instructed that, "[a]s with other opinion evidence, the extent to which an adjudicator can rely on the GAF rating as a measure of impairment severity and mental functioning depends on whether the GAF rating is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise." *Harris-Nutall, v. Colvin*, 2016 WL 3906083, at *5 (N.D. Tex. July 19, 2016) (*quoting Jackson*, at *3).

For the reasons set forth above, this case is hereby **REMANDED** to the Commissioner for further administrative action pursuant to the fourth sentence of 42 U.S.C. § 405(g).  This includes, but does not limit, sending the case to the hearing level with instructions to the Administrative Law Judge to consider claimant's updated medical records regarding her physical and mental impairments and order an updated consultative examination and residual functional capacity assessment, if necessary.  Claimant shall be afforded the opportunity to submit additional evidence and to testify at a supplemental hearing.

Inasmuch as the remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).  *See Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992) and *Shalala v. Schaefer*, 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993).

Signed this 27th day of July, 2016, at Lafayette, Louisiana.

**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**

13